## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

ARTHUR MORRELL and
CARL WOODLEY                                    CIVIL ACTION NO:

**PLAINTIFFS**

**VERSUS**                                      SECTION:

SEAN ALFORTISH, MONA ROMERO,                    MAGISTRATE:
EVELYN BENIOT,CARROLL J. CASTILLE,
CHRISTINE EARLY, WILLIAM R. FORMAN,
DON HARGRODER, KEITH BOURGEOIS,
SAM B. DAVID, GERALD ROMERO and
LARRY ROBIDEAUX, JR.

**DEFENDANTS**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

RACKETEER INFLUENCED AND CORRUPT ORGANIZATION *COMPLAINT
AND DEMAND FOR JURY TRIAL*
...............................................................

NOW INTO COURT, through undersigned counsel, come Arthur Morrell and Carl Woodley, of the full age of majority and residents of the State of Louisiana. Further, Morrell and Woodley ( hereinafter **plaintiffs**) are members of the Louisiana Horsemen's Benevolent & Protective Association 1993, Inc. (hereinafter **LHBPA**), a Louisiana non-profit corporation. Plaintiff Morrell is a former Board member of LHBPA, voted out of office, as well as two other Board members in 2008, pursuant to a "rigged election" with plaintiffs making the following representations:

1

**1.**

This court has jurisdiction over the claims and matters asserted herein pursuant to *28 U.S.C. § 1331*, as plaintiffs' claims arise under the laws of the United States, specifically *18 U.S.C. § 1961, et seq.*, the RICO Act.

**2.**

Venue is proper in this district pursuant to *28 U.S.C. § 1391(b)(2)*, as a substantial part of the events given rise to the claims occurred in the Eastern District of Louisiana and LHBPA has its corporate offices in Orleans Parish, Louisiana, which is found in the Eastern District of Louisiana.

**3.**

Made defendants are: (1) **Sean Alfortish**, (herein after "Alfortish") an individual of the full age of majority residing in the Parish of Jefferson, and who is President of LHBPA; (2) **Mona Romero**, an individual of the full age of majority residing in the Parish of Jefferson and who is the Executive Director of LHBPA**;** (3) **Evelyn Benoit**, an individual of the full age of majority residing in the Parish of Orleans and a director of LHBPA; (4) **Carroll J. Castille**, an individual of the full age of majority residing in the Parish of Jefferson Davis who is the Second Vice-President and a director of LHBPA; **(5) Christine Early,** an individual of the full age of majority residing in the Parish of St. Tammany and who is a director of LHBPA; (6) **William R. Foreman**, an individual of the full age of majority residing in the Parish of Beauregard and who is a director of LHBPA ; (7) **Don Hargroder,** an individual of the full age of majority residing in the Parish of Vermilion and

who is a director of LHBPA; (8) **Keith Bourgeois**, an individual of the full age of majority residing in the Parish of Lafayette and who is a director of LHBPA (9) **Sam B. David**, an individual of the full age of majority residing in the Parish of Bossier and who is a director of LHBPA; (10) **Gerald Romero**, an individual of the full age of majority residing in the Parish of Jefferson who is a director of LHBPA; and (11) **Larry Robideaux, Jr.** an individual of the full age of majority residing in the Parish of Bossier who is First Vice-President and a director of LHBPA.

## FACTUAL BACKGROUND

### 4.

### A. General Information

Plaintiffs are members of LHBPA and plaintiff Morrell is a former board member who was voted off the board, along with two other "reform members" in 2008 in an election that will be addressed below.  LHBPA is a not-for-profit corporation organized under the non-profit corporation laws of the State of Louisiana and is recognized as a 501(c)(6) organization for federal tax purposes. Additionally LHBPA **(a)** is recognized by Louisiana state statute as the legal entity empowered to represent the interests of race horse owners and race horse trainers in their dealings with the horse racing tracks located in Louisiana; **( b)** their dealings with the Louisiana State Racing Commission; and **( c)** with the Louisiana State legislature. In this position, LHBPA acts as a collective bargaining agent for horse owners and trainers in negotiating simulcasting agreements, advance deposit wagering agreements and purse structures with Louisiana-based race tracks. A principal

duty of the LHBPA is the handling of all purse monies paid out on all thoroughbred and quarter horse races run in the State of Louisiana. LHBPA also provides health benefits through a separate Medical Trust with LHBPA appointing and removing trustees as well as pension benefits to trainers through a separate, non-qualified Pension Trust for which LHBPA also appoints and removes trustees. LHBPA also offers workers compensation insurance through a captive, offshore insurance company. Further LHBPA also provides programs for the welfare of its members, including living conditions on the backstretches Louisiana race tracks, drug counseling, spiritual counseling through a track chaplain , and education programs.

**B. Governance and Membership in LHBPA**

LHBPA membership is determined annually and is comprised of those horse owners and trainers who have started at least one horse in one race during the year in which membership is being determined. Plaintiff Morrel is a horse owner; plaintiff Woodley is a trainer, as examples. LHBPA is govern by a board of directors consisting of five horse owners, five trainers and a president, all of whom are elected by the members and serve for a three-year term. LHBPA also employs a staff of individuals to operate as employees with the mission of carrying out the designated responsibilities of LHBPA. As an example, defendant, **Mona Romero** is Executive Director of LHBPA, appointed by the board. LHBPA maintains its corporate offices at 1535  Gentilly Boulevard, New Orleans, Louisiana, found near the Fair Grounds Race Track. Additionally, LHBPA has a field office at each of the four tracks currently licensed to conduct horse racing in Louisiana, in

particular; (1) Fair Grounds Race Course, New Orleans, Louisiana; (2)Louisiana Downs, Bossier City, Louisiana; (3) Delta Downs, Vinton, Louisiana and (4) Evangeline Downs near Lafayette, Louisiana.

**C. LHBPA and the purse money**

The race horse industry depends on "purses", defined as the money that horses race for. The purse money is derived from different sources, including **(1)** a portion of every dollar wagered on track; **(2)** a portion of every dollar wagered at off-track betting parlors; **(3)** a portion of every dollar wagered at other locations such as casinos and race tracks other than the one a race is being run; **(4)** monies from video poker machines and slot machines at race tracks; and **(5)** off-track betting parlors controlled by the race tracks.

Each race track collects its own purse money, creating a purse fund. By Louisiana statute, a track is required to pay out the purse money by the end of its race meet. During its live race meet, each race track publishes a "condition book." The book sets forth the schedule of races to be run at the track, the conditions for entering horses in those races and the amount of purse money that will be paid out on those races. The amount of the purse money will vary according to the caliber of horses eligible to enter each race and whether the race is limited to Louisiana-bred horses only or is open to horses bred in other states.

After a race is run, the race track remits the total purse money for that race to the LHBPA which deposits the purse money into its "horseman's bookkeeper account." By Louisiana statute, the LHBPA is allowed to deduct 6% of the purse money, as well as a $10.00 "pony fee." The balance from this transaction is credited to the accounts of the

owners/trainers entitled to share in the purse, as well as the Louisiana Thoroughbred Breeders Association, which also receives a portion of the purse money. Regardless, the monies in the "horsemen's bookkeeper account" **do not belong to LHBPA**.

**D. Horsemen's Bookkeeper Account**

The monies in the horsemen's bookkeeper account do not belong to the LHBPA and are held by the LHBPA in a form of "trust" for the benefit of the horse owners and trainers to whose accounts the monies are credited. The following were the balances in the horsemen's bookkeeper account as of March 31 for each of the years indicated below.

| Year | Total Amount |
| --- | --- |
| 2004 | $ 6,887,511 |
| 2005 | 12,061.121 |
| 2006 | 13,150,627 |
| 2007 | 22,122,589 |
| 2008 | 21,647,895 |

The amount of purse money handled by the LHBPA through its horsemen's bookkeeper account is significant. The following table sets forth the amount of purse money paid through the horsemen's bookkeeper account during each of the 12 months ending March 31 for each of the years indicated below:

| Year | Total Amount |
| --- | --- |
| 2005 | $ 90,413,885 |
| 2006 | 88,354,164 |

6

|      |             |
|------|-------------|
| 2007 | 107,636,245 |
| 2008 | 116,387,199 |

**E. Funding For LHBPA's Operations**

The LHBPA receives funding for its operations from a variety of sources. By Louisiana statute, the LHBPA is permitted to deduct 4% of the aggregate purse money remitted to the LHBPA for deposit into its horsemen's bookkeeper account. This is the LHBPA's principal source of revenue.

When the LHBPA started its workers compensation insurance program, it was authorized by the statute to deduct an additional 2% from the purse money to help build up reserves within the program. Recently, the 2% deduction for the workers compensation programs was reduced to 1% and 1% was redirected to fund the LHBPA's pension trust.

The LHBPA also receives revenue from its investment of idle funds. By statute, the LHBPA is permitted to invest a portion of the funds on hand in its horseman's bookkeeper's account and retain the interest which is generated by those investments.

The following table sets forth the total revenue of the LHBPA (exclusive of monies paid into the LHBPA's horsemen's bookkeeper account) for the 12 months ending December 31 for each of the years indicated. Revenue after this date cannot be reconciled by plaintiffs.

| Year | Total Annual Revenue |
|------|----------------------|
| 2005 | $2,128,930           |
| 2006 | 5,594.682            |

2007                          8,043,272

The foregoing, on information and belief is a factual rendition of the operations, sources of income and is meant to serve as an introduction to the LHBPA.

**5.**

Plaintiffs say that the wrongful <u>conduct of defendants outlined below</u> constitute a pattern of racketeering activity pursuant to *18 U.S.C. § 1961(5) et seq.,* as all such actions occurred within ten (10) years and are related and continuing. The pattern of racketeering activity constitutes a continuing open-ended pattern with an identical purpose, which is to defraud plaintiffs and other members of LHBPA to their right to honest services, and that defendants have breached their fiduciary duties unto plaintiffs.

**6.**

Plaintiffs further say that defendants Alfortish and Mona Romero engaged in a pattern of misconduct, including "rigging" the election of 2008 so that board members who were opposed to and questioning the actions of Alfortish and Mona Romero were not reelected.

**7.**

Plaintiffs also say that defendants' Beniot, Castille, Early, Forman, Hargroder, Bourgeois, Gerald Romero, David and Robideaux knew or had information to support the belief that the 2008 election was "rigged" **as early as September 2008** and did nothing, and continue to do nothing to this date, all to the detriment of plaintiffs.

8.

Plaintiffs say that Alfortish and Mona Romero also converted funds and services to their personal use, and that the method of commission (wire/mail fraud and money laundering) were interrelated by distinguishing acts and characteristics rather than isolate and *unrelated events*. This pattern of racketeering activity has existed for at least four (4) consecutive years including the "rigged" election of Alfortish and other defendants, and on information and belief continues to this day, thus posing long term constituted criminal activity.

9.

## COUNT ONE: The Rigging of the March 2008 Election and Mail/Wire Fraud

**A. History of the Election**

In March 2005, the LHBPA conducted an election of directors and for the office of president. In that election, defendant Alfortish defeated the incumbent president and thereafter assumed the office of president. Also in that election, plaintiff, Arthur Morrell, Thomas Ball and another individual were reelected to seats on the board of directors.

On August 29, 2005, Hurricane Katrina struck southeast Louisiana and inflicted extensive physical damage to the horse-racing industry throughout a large portion of Louisiana. Both the Fair Grounds Race Course and the LHBPA's corporate office suffered extensive wind and flood damage.

This was followed in September 2005, by Hurricane Rita, which also inflicted

extensive physical damage on the horse-racing industry in the state. The storm damage at the Fair Grounds Race Course was so great that the race track was unable to open for its 2005-2006 race meet on Thanksgiving Day 2005. The LHBPA temporarily relocated its corporate office to Bossier City during the Fair Grounds' 2005-2006 race meet due to the damage.

Following Hurricanes Katrina and Rita, defendant and President of LHBPA, Alfortish, breached his fiduciary obligations to plaintiffs and the membership of LHBPA by disregarding many of the corporate governance rules by which the LHBPA was run with Alfortish acting  under the guise of taking "emergency" action. At all times, on information and belief, Mona Romero was his co-conspirator.

During the latter part of 2005 and the first half of 2006, large amounts of money were expended by defendants Alfortish and Mona Romero.  Ostensibly, these monies were expended for legitimate corporate expenses, including the repair of the LHBPA's corporate office at 1535 Gentilly Blvd.  However, as found below, the disbursement of these funds did not comport with Louisiana law and the LHBPA's own bylaws, and constitute a misuse of the funds in question.

Following Hurricanes Katrina and Rita, the LHBPA received nearly $800,000 in donations from horse-racing interests around the country.  These donated funds were supposed to be used to benefit horsemen who were adversely affected by the two hurricanes .  However, as found below, these funds were mishandled, with no records made available to plaintiffs after amicable demand.

10

On information and belief, defendant Alfortish, along with defendant Mona Romero and others, began misusing and abusing the LHBPA's corporate credit cards by charging personal and other non-business items against the cards and causing the bills to be paid by the LHBPA.

On information and belief, plaintiff Morrell, Mr. Ball, another director, as well as a third individual, in their capacities as directors of the LHBPA, attempted to obtain accountings and other information regarding the disbursement of the LHBPA's funds from defendants Alfortish and Mona Romero, as well as information as to the handling of the "hurricane relief funds", and the use of the LHBPA's corporate credit cards.

The efforts of plaintiffs, as well as plaintiff/director Morrell, Mr. Ball and a third individual in attempting to obtain this information caused a rift to develop between them and defendants Alfortish and Mona Romero, thus giving defendant Alfortish reason to want them off of LHBPA's board of directors.

## B. The March 2008 Election

In March 2008, the LHBPA held another election of directors and a president with the elected individuals to serve for new three-year terms of office. In the March 2008 election, defendant Alfortish was reelected to the office of President and Messrs. Morrell and Ball and the **third director aligned with them were defeated** in their bids to retain their seats on the board.

## C. Events Subsequent to the March 2008 Election

Immediately following the election, Messrs. Morrell and Ball challenged the results,

contending that defendant Alfortish and others had engaged in electioneering practices in violation of specific prohibitions in the LHBPA's bylaws.

The LHBPA held a hearing  in which the persons allegedly elected as directors in the March 2008 **election were asked to rule on the validity of their own election**. With no surprise, the "new" directors (also current directors, save one) found no wrongdoing and dismissed the election challenge filed by Messrs. Morrell and Ball.

Subsequent to that hearing, **Tammy Broussard**, an LHBPA employee with responsibility for workers compensation matters, **came forward with allegations that she**, defendants **Mona Romero** and **Gerald Romero**, and **Cricket Romero** acted to rig the election **by casting a large number of fraudulent ballots**.  Defendants Mona Romero and Gerald Romero are husband and wife.  Cricket Romero is married to Gerald Romero's brother.

As told by Ms Broussard, she, Mona Romero and Cricket Romero **fraudulently filled out several hundred ballots, sealed them in ballot envelopes, and wrote the social security numbers of various LHBPA members on the envelops**. They then enclosed the ballot envelops in business reply return envelops, and divided the business reply return envelops into groups for mailing by different individuals from different parts of the state. According to Ms. Broussard, **she and Gerald Romero were two of the individuals assigned to mail the fraudulent ballots.**

United States Postal Inspectors thereafter commenced an investigation into the March 2008 election.  Federal jurisdiction was based on the fact that all ballots were

required to be transmitted through the United States mail, such that a **mailing of a fraudulent ballot was an act of mail fraud.**

In September 2008, the LHBPA's board of directors was informed of Ms. Broussard's allegations as to how the March 2008 election had been rigged. The "board" did nothing, thus furthering the scheme of Alfortish and Mona Romero.

## C. Wire/Mail Fraud

Defendant **Mona Romero**, operating with and through defendant Alfortish and various other individuals, including those named above, orchestrated a scheme to use the U.S. Mails to "rig" the 2008 election of the LHBPA which scheme defrauded plaintiffs and was carried out through the use of the United States Mails and Wires in violation of *18 U.S.C. §§1341, 1343.* The uses of the United States Mails and Wires consisted of numerous acts for the common purpose of carrying out the fraudulent scheme.

## D. Non-Action of Other Defendants

Although advised by the LHBPA's general counsel to hold a special board of directors meeting for the sole and exclusive purpose  deciding whether to commence its own investigation into Ms. Broussard's allegations as to the rigging of the March 2008 election, the board of directors declined to hold such a special meeting.  Despite a bylaw which required that board meetings are to  be held every other month, the board declined to hold another board of directors meeting for nine months.

## E.  Other Events That Support Mail Fraud

On or about March 13, 2009, the United States Postal Inspection Service sent over

275 letters to members of the LHBPA advising them that they had been"identified as a possible victim of alleged mail fraud" as part of "a conspiracy to use the U.S. Mail to rig the election of officers to the Board of Directors" of the LHBPA.

In the summer of 2009, the LHBPA was served with a federal subpoena ordering it to produce documents that, by the LHBPA's own admission, was the fifth subpoena serviced on it. This subpoena apparently encompassed so many records that the LHBPA had to request additional time to respond to the subpoena and had to hire additional employees to assist in copying the documents that were responsive to the subpoena.

LHBPA has consistently delayed in making records available to plaintiffs and other members who have requested same, including the ballot envelops from the March 2008 election and the records as to how the funds that were donated to LHBPA following Hurricanes Katrina and Rita were handled. Plaintiffs and others have made numerous demands on defendants' defendants' Beniot, Castille, Early, Forman, Hargroder, Bourgeois, Gerald Romero, David and Robideaux for the ballots and other documents. The ballots have been denied to plaintiffs even though plaintiff Morrell, when demand was first made, was a member of the Board and entitled to see them.

Plaintiffs say that their demand on the LHBPA's board of directors that the board fulfill their fiduciary duties and responsibilities to the members by taking action with respect to certain breaches of fiduciary duty and acts of mismanagement and malfeasance by officers and members of the board have not been acted on. Further, plaintiffs are aware that defendants Alfortish and Mona Romero have employed criminal defense lawyers, at

14

LHBPA expense, paying same in advance, all in violation of the bylaws of LHBPA.

**10.**

**COUNT TWO: Self Dealing and misuse of LHBPA Funds Regarding Roughneck Construction.**

**A. )Transactions With Roughneck Construction**

Following Katrina, the LHBPA engaged Roughneck Construction to repair its corporate office at 1535 Gentilly Blvd., expending hundreds of thousands of dollars in the process. Regardless, LHBPA bylaws provide that such a contract could only be authorized by the board of directors and no such contract was ever authorized by the board of directors. Although the bylaws required that the checks used to pay for such expenses be signed by two authorized individuals, the checks given to Roughneck Construction were not signed by two individuals. In the possession of plaintiffs are numerous checks signed by defendant Alfortish only.

On information and belief, the board of directors also failed to obtain any written contract with Roughneck Construction for the work performed at its corporate office. On information and belief, the board of directors also failed to maintain adequate records of the work performed by Roughneck Construction.

**B. Misuse of LHBPA and other funds for the Benefit of Alfortish.**

The LHBPA also paid Roughneck Construction at least **in part with money that did not belong to the LHBPA**, namely **funds in the Fair Grounds Video Poker Settlement Account** and the **Louisiana Downs Video Poker Settlement Account** that belonged to certain owners and trainers. On information and belief, at the same time as Roughneck

15

Construction was performing repairs to the LHBPA office at 1535 Gentilly Blvd., Roughneck Construction or persons working for Roughneck Construction were also performing repairs and/or renovations at the home of defendant Alfortish in Kenner, Louisiana. Plaintiffs have two sworn affidavits from two former LHBPA employees that allege that LHBPA funds were used to pay for repairs and/or renovations by Roughneck Construction at defendant Alfortish's home.

These transactions indicate that defendant Alfortish **received funds** that did not have a legitimate LHBPA purpose , and  were for his  personal use. Interestingly, in newspaper accounts, defendant Mona Romero admits that defendant Alfortish received free repairs/sound system and a computer system at his home.

Plaintiffs say that as defendant Alfortish , who at all times had a fiduciary duty to plaintiffs and the members of LHBPA, acted in a manner that can only be considered a conspiracy and for the exclusive benefit of the participants. Plaintiffs say that the above action easily   state a civil claim under the **Racketeer Influenced and Corrupt Organizations Act** (RICO), and that plaintiffs will show that  defendants  violated the Act, and  that the plaintiffs were injured as  a result of the violations, in particular  breach of fiduciary duty, honest services, misuse of funds of their organization to such an extent that it may be financially imperiled and causing LHBPA to spend thousands of dollars on criminal attorneys at the expense of plaintiffs and their association.

Plaintiffs say they  are entitled to and seek damages against all defendants *in solido,* pursuant to this statute, in such amount as will fully compensate plaintiffs and other

members of the LHBPA for all losses sustained to date and which may be sustained in the future as a result of the defendants' breach of fiduciary duties and other wrongful acts in the unauthorized and improper dealings with Roughneck Construction, including all overcharges and improper billings resulting therefrom.

11.

**COUNT THREE:     Misuse of Funds in the Louisiana Downs Video**
**                          Poker Settlement Account and the Fair Grounds Settlement**

**A.) The Louisiana Downs Video Poker Settlement Account**

In 1994, The LHPBA filed suit against several race tracks then operating in Louisiana, contending that the race tracks were incorrectly calculating the portion of the video poker revenues that, by statute, were to be used as purse money. The LHBPA also contended that this error resulted in an underpayment of purse money by the race tracks during the years in question.

After many years of litigation, Louisiana Downs entered into a settlement with the LHBPA, pursuant to which Louisiana Downs paid a stipulated amount of money to the LHBPA for redistribution by the LHBPA as purse money to those owners whose horses had won purse money during the years in question. After paying legal fees and expenses attributable to the recovery from Louisiana Downs and deducting its statutory percentage for overhead, the **LHBPA had the remaining funds deposited into the Louisiana Downs Video Poker Settlement Account**. The LHBPA then caused checks drawn on the Louisiana Downs Video Poker Settlement Account to be issued to those owners entitled to share in the

settlement. The funds remaining in the Louisiana Downs Video Poker Settlement Account represented the funds necessary to cover the settlement checks to those owners entitled to share in the settlement that had yet to be cashed. Plaintiffs say **that an unknown amount of these funds were misspent by defendants Alfortish and Mona Romero** and further that this matter was brought to the attention of defendant board members who have done nothing known to plaintiffs to correct or account for these funds.

On information and belief, plaintiffs allege that during February and March 2006, one or more of the defendants breached their fiduciary duties and committed other wrongful acts **by causing at least $134,320.44 to be withdrawn from the Louisiana Downs Video Poker Settlement Account** and used improperly for purposes other than the payment of settlement proceeds to those owners entitled to share in the settlement who had not yet cashed their settlement checks.

On information and belief, plaintiffs allege that the balance in the Louisiana Downs Video Poker Settlement Account was $408,161.37 at January 31, 2008.  Over the next 12 months, one or more of the defendants breached their fiduciary duties and committed other wrongful acts by causing the balance in the Louisiana Downs Video Poker Settlement Account to be reduced by over $225,000.00 to $183,513.65

On information and belief, plaintiffs allege that a majority of the more than $225,000.00 that was withdrawn from the Louisiana Downs Video Poker Settlement Account during this 12-month period was used improperly for purposes other than the payment of settlement proceeds to those owners entitled to share in the settlement who had not yet

cashed their settlement checks.

At least $116,155 of the funds in the Louisiana Downs Video Poker Settlement Account was **used improperly to make payments to Roughneck Construction**.

**B.) Fair Grounds Settlement**

In 2004, the LHBPA obtained a large multi-million dollar judgment against the Fair Grounds Corporation in its video poker law suit. The judgement eventually caused the Fair Grounds Corporation to file for relief under Chapter 11 of the U.S. Bankruptcy Code. During that Chapter 11 proceeding, the LHBPA reached a settlement and compromise of its judgment whereby it received $25,000,000 in settlement of its claim in the bankruptcy proceeding for redistribution by the LHBPA as purse money to those owners whose horses had won purse money during the years in question.

After paying the legal fees and expenses attributable to the $25,000,000 recovery from the Fair Grounds bankruptcy proceeding and deducting its statutory percentage for overhead, **the LHBPA caused the remaining funds to be deposited into the Fair Grounds Video Poker Settlement Account.**

The LHBPA then caused checks drawn on the Fair Grounds Video Poker Settlement Account to be issued to those owners entitled to share in the settlement. The funds remaining in the Fair Grounds Video Poker Settlement Account represented the funds necessary to cover the settlement checks issued to those owners entitled to share in the settlement that had yet to be cashed.

On information and belief, plaintiffs allege that between March 2006 and May 2006,

one or more of the defendants breached their fiduciary duties and committed other wrongful acts by causing **at least $138,600 to be withdrawn from the Fair Grounds Video Poker Settlement Account and used improperly** for purposes other than the payment of settlement proceeds to those owners entitled to share in the settlement who had not yet cashed their settlement checks.

On information and belief, plaintiffs allege that the balance in the Fair Grounds Video Poker Settlement Account was $541,792.56 at May 31, 2006. Over the next three years, one or more of the defendants breached their fiduciary duties and committed other wrongful acts **by causing the balance in the Fair Grounds Video Poker settlement Account to be reduced by over $518,000 to $23,459.48.**

On information and belief, plaintiffs allege that most of the more than $518,000 that was withdrawn from the Fair Grounds Video Poker Settlement Account during this three-year period was used improperly for purposes other that the payment of settlement proceeds to those owners entitled to share in the settlement who had not yet cashed their settlement checks.

**At lease $227,443.74 of the funds in the Fair Grounds Video Poker Settlement Account was used improperly to make payments to Roughneck Construction.**

Plaintiffs are entitled to recovery against all defendants *in solido* in such amount as will fully reimburse the Louisiana Downs Video Poker Settlement Account and the Fair Grounds Video Poker Settlement Account for all monies wrongfully or improperly withdrawn from such accounts, as well as damages they suffered as will be shown at the

trial of this matter. Plaintiffs say that the above actions by defendants state a civil claim under the **Racketeer Influenced and Corrupt Organizations Act** (RICO), and further plaintiffs will show that the defendants violated the Act, and that plaintiffs were injured as a result of the violations.

**12.**

**COUNT FOUR: MISUSE OF HURRICANE RELIEF DONATIONS**

_____Following Hurricanes Katrina and Rita, the national HBPA (of which the LHPBA is an affiliate), and HBPA affiliates in Pennsylvania, Arkansas, Minnesota and Ontario, and other persons and organizations associated with the horse racing industry **donated a large amount of money to the LHBPA with the intent that the LHBPA, in turn, distribute these funds to needy individuals in the Louisiana horse racing industry**. The officers and directors of the LHBPA thus owned a fiduciary duty to the members of the LHBPA to see that the donated funds were used for the intended purposes. On information and belief, Plaintiffs allege that the aggregate amount of funds so donated to the LHBPA exceeded $778,000. Plaintiffs rely on the sworn statement of Nelson Menard who was tasked by defendant, Mona Romero to compile a list of funds received and distributed.

On information and belief, plaintiffs allege that defendant Alfortish and other defendants caused some or all the hurricane relief donations **to be transferred to an alleged charitable foundation which they controlled.** This entity is called the "Louisiana Horsemen's Benevolent and Protective Association Charitable Foundation, Inc. ." The original directors were defendants Sam David, Larry Robideaux, Gerald Romero and

Alfortish, all named defendants in this complaint. Tom Ball was listed as a "director" but asserts that no meeting was every had and further is not a party to this complaint. On information and belief, plaintiffs allege that thereafter, defendant Alfortish and other defendants caused the hurricane relief donations to be disbursed to whom ever they wanted to, **including themselves**, even though the By-laws say that no earnings "...shall inure to the benefit of or be distributable to its incorporators, officers or other private persons...".

Thus plaintiffs say that defendants breached their fiduciary duties by failing to keep adequate records, or see that adequate records were kept, showing how and why payments were made to certain individuals. Plaintiffs further say that they have not been able to locate any tax filings, whatsoever with the Internal Revenue Service, thus putting plaintiffs and LHBPA, and plaintiffs' position as members at risk for the tax consequences, if this is indeed the case.

Defendants, including the named board members in this complaint, at all times relevant to these proceedings were in the position of being able to stop the disbursement of these funds, but took no steps to do so, on information and belief, thus becoming participants in the scheme, as will be shown at the trial of this matter.

On  information and belief and as more particularly alleged hereafter, plaintiffs allege that the defendants responsible for distributing the hurricane relief donations breached their fiduciary duties and committed other wrongful acts by misusing a portion of the donations by utilizing the funds for their own personal purposes or by distributing the funds to persons not entitled to same. Specifically plaintiffs say that defendant Alfortish

22

benefitted from a sound system and other electronic devices installed at his residence with defendant Mona Romero issuing the checks.

Further on information and belief, plaintiffs allege that the defendants further breached their fiduciary duties by steadfastly refusing to provide plaintiffs and other members with an accounting of the hurricane relief funds donated to the LHBPA or how those funds were disbursed.

On information and belief, plaintiffs allege that the board of directors' refusal to provide its members with an accounting of the hurricane relief funds donated to the LHBPA and how those funds were disbursed was due, at least in part, to the fact that certain of the defendants and/or their close business associates benefitted disproportionately from the hurricane relief donations. For example, on information and belief, plaintiffs allege that Evangeline Training Center received payments totaling in excess of $152,000; that Robert J. Adams, defendant Alfortish's personal horse trainer, received at least $16,062; that defendant Early ( an LHBPA board member) received payments totaling approximately $14,000; that defendant Bourgeois received at least $10,206; that C.R. Winfree, who is believed to be related to defendants' Mona and Gerald Romero and was not otherwise then affiliated with the LHBPA, received $10,000; that defendant David ( a Board member) received at least $9,100; and that defendant Mona Romero received $2,500 in addition to having many of her personal living expenses paid for by the LHBPA. On information and belief, plaintiffs allege that a person identified as Henry Frey received $23,684.50 and **that there was no member of the LHBPA by the name of Henry Frey.**

As found above, plaintiffs, at their expense, have located the filing with the Louisiana Secretary of State that is believed to be the "entity" that controlled these funds, with plaintiffs saying that the document itself precludes members of the LHBPA board from receiving any benefit, whatsoever from the "fund".

Plaintiffs are entitled to and seek a full accounting from defendants of all money donated to the LHBPA and damages as may be found after trial of this complaint against all defendants *in solido* in such amount as will fully reimburse the LHBPA for all donated funds that were misused or misapplied in any fashion, as well as compensate the LHBPA and its members for all losses it has sustained and may sustain in the future by reason of defendants' breach of fiduciary duty, wrongful acts, misfeasance and malfeasance on the administration of the funds so donated to the LHBPA.

Plaintiffs suggest that defendants breached their duties to plaintiffs and the membership of LHBPA by participating in a scheme to enrich themselves and others, knowingly fully well that such conduct was illicit on its face and a breach of their fiduciary duty and all acting in concert as co-conspirators.

## 13.

The schemes, detailed above, devised and employed by defendants under the control of defendant Alfortish and defendant Mona Romero resulted in improper payments to be made to other entities which defendant Alfortish controlled or influenced, including numerous law firms, construction companies, insurance service providers as well as charging expenses against LHBPA for the personal benefit of defendant Alfortish and

defendant Mona Romero. Defendants received money and benefits which they were not entitled to, thus decreasing the funds available to LHBPA members and plaintiffs, as well as causing LHBPA members to be potential burdened with increased "costs" such as criminal lawyers for defendants, all paid for through LHBPA.

### 14.

### CAUSES OF ACTION
### RICO VIOLATION

Plaintiffs *realledge* and *reavers* the allegations of paragraphs 1-13 as if copied herein *in extenso.*

### 15.

Plaintiffs will show that defendant **Alfortish** and defendant **Mona Romero** actions, as detailed above, blessed and allowed by defendants' and board members, **Beniot, Castille, Early, Forman, Hargroder, Bourgeois, David, Gerald Romero** and **Robideaux** are an enterprise which effects interstate commerce, as many acts of defendants, found herein, were undertaken in foreign and alien venues, with plaintiffs saying that defendants received funds from other states, managed a "captive insurer" in an alien venue, and that defendants converted funds from LHBPA in domestic, foreign and alien locations, thus plaintiffs say that an effect on interstate commerce is without question.

### 16.

All defendants are each RICO "persons" pursuant to *18 U.S.C. §1961(3).*Each of the defendants has been conducting business through a pattern of racketeering activity, and

each participated in the conduct of the affairs of the RICO enterprise, specifically the association known as LHBPA, with defendants  in fact comprising the entities and individuals **which  controlled LHBPA after the "rigged" election** and are the legal proximate cause of injuries and damages to plaintiffs and the LHBPA membership as set forth herein.

**17.**

The predicate acts engaged in by defendants, which comprise a pattern of racketeering activity are as follow:

**WIRE AND MAIL FRAUD**

1.  Defendant Mona Romero, operating with and through Tammy Broussard and various other individuals, many named above, and  some not named as defendants herein, orchestrated a scheme to "rig" the 2008 election,  which scheme to defraud plaintiffs was carried out through the use of the United States Mails and Wires in violation of *18 U.S.C. §§1341, 1343.* On information and belief the individual uses of the United States Mails and Wires consisted of numerous acts for the common purpose of carrying out the fraudulent scheme, including those identified herein;

2.  The scheme to defraud plaintiffs and other members of LHBPA of honest services, misuse of LHBPA funds, "rigging " an election and the misuse of funds of other entities, under the control of defendants, was executed by obtaining funds by wire and the Unites States Mail in interstate commerce.

3.      Defendants have affirmed in numerous public statements and statements under oath as to irregularity at LHBPA while at the same time engaging in the dissemination of false statements, failing to present any financial statements to show valid operating charges and expenses, and using the United States Mail in such dissimilation.

4.      All defendants  breached their duty of honest services by violating their fiduciary duty to plaintiffs and other members of LHBPA, as well as the laws of the State of Louisiana and the United States of America.

5.      Defendants breached their duty to provide annual reports of the financial status of LHBPA, with defendants conducting the business of LHBPA through a pattern of racketeering activity, with each participating in the conduct of the affairs of the RICO enterprise, specifically their association in comprising the entities and individuals, through this scheme, as well as using their  control of LHBPA, obtained through a "rigged" election, for their benefit and the benefit of others, and therefore are the legal proximate cause of injuries and damages to plaintiffs as set forth herein.

6.      Defendants  failure to provide an accounting for LHBPA was rendered with the specific intent to deprive plaintiffs and other members of LHBPA of the proper use of their association, plaintiffs assessments as members, as well as to conceal their improper payments or services/benefits for their personal use.

7.      Plaintiffs say that due to the action/inaction of defendants, plaintiffs have no

accounting/financial records that are true or accurate for LHBPA, and with

which defendants were entrusted.

8.      Defendants fraudulent scheme to defraud plaintiffs was carried out through

the use of the United States Mails and Wires in violation of *18 U.S.C. §§1341,*

*1342,* constitutes a pattern of racketeering activity under *18 U.S.C. §1961(1)*;

## MONEY LAUNDERING

9.      Defendants have engaged in Money Laundering in violation of *18 U.S.C.*

*§§1956(a)(1)(A)(1)(l)* and *1956(a)(1)(B)(l)*, with full knowledge that monetary

transactions involving the proceeds of felonious activity ( the ill-gotten gains

from the racketeering scheme alleged herein) did knowingly, intentionally

and willfully conduct and cause to be conducted numerous monetary

transactions by financial institutions engaged in, and the activities of which

effect, interstate and foreign commerce, with funds actually derived from the

pattern of racketeering activity under *18 U.S.C. § 1961(1)* [wire and mail fraud

as an example], such as: (1) the financial dealings engaged in with Roughneck

Construction by Alfortish; (2) payments by check and/or wire transfer of

revenues from the "Hurricane Relief Fund", (found herein) , between and

among the defendants in payment of fraudulent invoices, which transactions

concealed the true nature, source, origin and true ownership of the funds

transferred;(3) further distribution of the ill-gotten gains from the defendants

28

to associates and attorneys which distributions were "laundered" for the purpose of making the funds so transferred appear legitimate, thus concealing the fact that said funds were ill-gotten gains derived from the pattern of racketeering activity detailed herein and promoting the racketeering enterprise by permitting the defendants to function and appear as legitimate individuals/entities; and (4) distributing funds by check and wire transfer to pay such items as "sound systems" and other electronic items for Alfortish, misuse of donations given to their trust from the "Hurricane Relief Fund" ,all of the foregoing examples entered into by defendants in order to maintain an appearance of legitimacy and promote the racketeering enterprise, all of which distributions were "laundered" for the purpose of making the transferred funds appear legitimate, thus concealing the pattern of racketeering activity detailed herein and further promoting the racketeering enterprise.

10.     Defendants conducted or caused to be conducted or engaged in deliberate indifference to each and every monetary transaction, as alleged above, involving criminally derived property knowing in fact that the source of these funds was an unlawful racketeering scheme (constituting specified unlawful activity within the meaning of *18 U.S.C. §1956 ( c )(7)(A))*, with reference to *18 U.S.C. § 1961(1)* [wire and mail fraud] described herein.

11.     Each monetary transaction, described above, was performed with specific

intent, to promote, carry on and further the pattern of racketeering activity described herein, including the use of funds to pay construction costs of LHBPA and attorneys in order to maintain an appearance of legitimacy for the defendants, all essential to the RICO scheme.

12. Each monetary transaction for payment to defendant, Alfortish, as well as the "expenses" of Alfortish and Mona Romero were performed by defendants with specific intent to hide, conceal from plaintiffs and third parties, including the United States government and disguise the nature, location, source ownership and control of the proceeds of the pattern of racketeering activity described herein.

**18.**

As a result of defendants' violation of the *RICO Act*, plaintiffs are entitled to treble damages, legal interest, and reasonable attorney's fees, all pursuant to *18 U.S.C. §1964( c )*.

**19.**

Plaintiffs reserve the right to amend these pleading for the purpose of a class action.

**20.**

Plaintiffs request trial by jury.

**WHEREFORE**, plaintiffs pray that after due proceedings had, that there be judgment herein in favor of plaintiffs and against defendants for all damages which plaintiffs have sustained as a result of the defendants' wrongful conduct, including treble damages,

reasonable attorney's fees, all costs of this action, interest according to law, and for any additional relief as the evidence may support or that equity and the cause may require.

Respectfully submitted,

/s/ Madro Bandaries

_____
Madro Bandaries, #25339
Edward Lee Moreno, #30838
MADRO BANDARIES, PLC
938 Lafayette Street, Suite 204
New Orleans, LA 70113
Telephone:    (504) 218-4815
Facsimile:     (504) 324-0684
Email: madro.att.net@gmail.com
Email: edward.lee.moreno@gmail.com
**ATTORNEYS  FOR PLAINTIFFS**